Our first case for argument is Morataya-Martinez v. Whitaker. Good morning, Your Honors. May it please the Court, I am Anne Berhom for the Petitioner, Anna Morataya-Martinez. I would like to reserve two minutes of my time for rebuttal. The central issue in this case— I ask that going in case issue just—I just—I get oriented. The BIA went—determined that there was no persecution, but was there a question about what the protected ground is and whether—has that ever been litigated here? What is the protected ground? Well, if I may, I think the central issue in this case is the fact that the Petitioner revealed for the first time in court that she was violently gang-raped at the age of 11 by five men. And I think what the judge did not take into full consideration was, first of all, that this was a revelation. And Ms. Morataya-Martinez stated that this was the worst possible thing that had ever happened to her in her life. So there was only two pages of actual testimony in this case. So I gather you don't want to answer my question. Okay. My question is, all right, given that or anything else, what's the protected ground here, the nexus? Or is that not in the case because nobody's litigated it yet? No one stated what the protected ground was. Well, she filed an application, right? She did file an application. In the application, she checked political opinion and the social group. Social group. She did not. I mean, it was not clearly identified from the record that I saw that she identified the particular social group in terms of the rape. The political ground was because of the guerrilla activity and threats against her by the guerrillas. But the BIA accepted that or the IJ or has just never litigated it? I'm just trying to find out where we are in the case. Right. They never identified per se what the political group was. So essentially, if we decided there was persecution, it would go back on that issue. Exactly. All right. Exactly. That's all I was trying to find out. But the IJ and the BIA did not find that the petitioner suffered past persecution at all, which if you read through her declaration, her first declaration, as well as her second declaration, plus her testimony on the stand, it's hard to believe that there wasn't past persecution. If I may, if you turn to the record on her testimony, she revealed that she was gang raped at age 11 and a half by five men from her community. She knew three of those perpetrators. She was taken to the hospital. She reported the crime or the police came and interviewed her about the crime, and yet nothing was done to protect her from those perpetrators. She continued to see the perpetrators in the community after that. If I may, she was 11. She was female. She was poor. She was also an orphan. She had a second-grade education and no one to protect her. We don't know the extent of her injuries because it was never asked. The judge gave very short shrift analysis of what happened to her. In fact, when reading the testimony, it appears that they just wanted to get through the trial. Several times the judge said, let's move on, even after the petitioner revealed that she had been gang raped and turned to her attorney and said, let's move on. So I think there was not a full analysis of what happened to this woman when she was a mere child. Following that, the petitioner was attacked on several occasions by guerrillas between 1986 and 1989, and yet the judge nor the BIA referred to that extended period of time. It appears from their decision in both cases that it was just, you know, a few encounters. But by reading her first declaration and her asylum application, it's really clear that this was an ongoing assault. But when she testified, you could get that impression by reading the declaration. But when she testified, she said quite clearly that they came four times and that was it. I mean, four times is four times, but I don't think one can read back into the declaration something more than that. I understand your point on that, and I wondered about that myself. But nonetheless — Kagan. I mean, her testimony was admirably specific in general. I mean, and she was very specific about that. She was specific. I agree. However, it did take place over an extended period of time. And I might point out that in Garcia-Martinez v. Ashcroft, one of the cases that — Also, if I can say one other thing. If you read the declaration, you wouldn't think that she was hurt at all. She never said anything in the declaration about her being hit or shoved or anything else. But she did in testimony. So either you have to take the testimony or the declaration. I think you're better off taking the testimony. I understand, but I also — I think that many of these victims of persecution are not exactly — do not exactly understand the — what we, as lawyers, are looking for or what the law requires. So she wrote that petition — or that declaration back in — that testimony is much more specific about the injury, and it's also more specific about how many times they came and so on. So let's just take that. I understand your point. I think, however, if you look at, you know, cases like Garcia-Martinez v. Ashcroft, a 2004 case, it notes that the Civil War in Guatemala lasted for 36 years, from 1960 until 1996. The petitioner was born in 1962, and she was raped in 1973. So I think there are a lot of facts that have not been disclosed about what happened exactly around the rape in particular and how that positioned her for the future. We don't — there's just not enough information in the record. Do you represent her at the hearing? I was not — I was not — I did not — I was not the attorney at that time. So I — what I've read is from the record. But I am struck by the fact that this woman revealed for the first time that she was gang raped at age 11 1⁄2. And given what we know today about sexual assault, especially of children, this is pretty much a jaw-dropping revelation, in my view. So how do you put that into a legal structure? Is this a request for a humanitarian asylum? What is it exactly? Because presumably it's not — there's no connective, with regards to it, of either political or social group that's been articulated anyway, right? And the — I mean, presumably she's not going to be able to show a fear of future persecution, no matter who the burden's on, with regard to that. So it must be a claim for humanitarian asylum. Is that what it is? I mean, the BIA seemed to think so because it said something about humanitarian asylum. Is that what you're arguing? Well, my argument is that there was indeed past persecution in this case. On account of? On account of political opinion in terms of — So the rape was on account of political opinion? No, the rape is on account of a particular social group. Being? If you look at Perdomo v. Holder, it was held that women in Guatemala represents a cognizable particular social group. I think you could argue it was not developed in this case appropriately because she just revealed it at trial. And how — I think — Is Perdomo in your brief? Pardon? In your brief, do you argue this? I'm sorry, I'm — In your brief, do you argue what the basis for asylum because of the rape would be? Yes, that she was a child and a female and that she suffered a horrific gang rape at a tender age. Okay, did you want to — you've exhausted your time, so you can — Can I still have my two minutes or not? I'll see. Most a minute. Let's hear from the government. Okay, thank you, Your Honor. Good morning, Your Honors. My name is Beau Stanton. I'm here today on behalf of the United States Attorney General. The facts of this case are straightforward, and some of these facts are deplorable, just as the immigration judge described. But when you take these facts individually or altogether, they do not compel the conclusion that the petitioner in this case is eligible for asylum, withholding removal, or protection under the convention against torture. In particular, discussing the — Well, the rape — just a minute. The rape would constitute past persecution, wouldn't it? In this particular case, the immigration judge determined that it did not rise to past persecution because the rape itself was not on account of a protected ground. Well, that's a different issue. That's a different issue. But I'm asking whether it would amount to past persecution. Well, to determine whether or not something amounts to past persecution, it's a two-pronged analysis. First, you've got to determine whether or not the harm rises to the level of persecution, whether or not that —  That's what I'm asking. All right. It would. Yes? It does. Is that correct? A rape. A rape. Definitely under this case law, yes. Rape would definitely rise to the severity of harm. All right. So you think — Yes. So you think what the I.J. found about the rape was that it wasn't on account of? Where is that? That is exactly what he found. Actually, if you go to his decision, he made it very clear that he thought this was a random criminal act carried out by individuals. So he did consider this and did consider whether or not it was on account of a protected ground. But if you look at the petitioner's testimony, when asked directly about why did they do this, she testified — You can look at the record, AR-115. She speculated that it was due to a lot of violence in her country and because there are a lot of very twisted, dirty men out there. All right. But she now says, although I don't know that it's in her brief, that there is a case that says that women in Guatemala can be a protected social group. Is there such a case? There is. So in that case, actually, Pradama, which she's discussing, that was set back on remand to the board to consider whether or not Guatemalan women as a group could be considered a particular social group. So that case that she cited does not stand for that proposition. But in any event, this particular social group was not articulated and presented to either the immigration judge or the Board of Immigration Appeals. Instead, the reasons that the petitioner gave for being afraid to go back, for example, to Guatemala was there's a lot of violence in her country. Her and her son might be fingered for having money because they're coming from the United States and may be targeted for that reason, that they might appear wealthy. She may also be targeted because they are deportees. None of the reasons given was because of her membership in a particular social group. And the Board of Immigration Appeals did address in its decision whether or not wealthy, affluent individuals could be a particular social group and pointed to its own case law and the circuit's case law in stating that this has been firmly rejected. And so ultimately, when the immigration judge addressed the issue of rape, he did find his exact words. This is a deplorable act. He recognized the severity. He was not being dismissive. But he was looking at the facts of the case. And there was no protected ground. Even opposing counsel hasn't been able to point to the record and identify a protected ground. Instead, she's waiting. Didn't she allege in her application political opinion was the protected ground? Actually, it's imputed political opinion. Yes, you're right. She did say imputed political opinion, also particular social group. She actually says the same thing in her brief but fails to articulate what that political opinion was, fails to articulate the particular social group and the particular social group. Isn't it connected to the gorillas that were looking for her brother-in-law? I mean, you could speculate that. Yes, Your Honor. Well, that's what her testimony was, was that the gorillas were looking for her brother-in-law and confronting her. Right. They were looking for her brother-in-law, who had been a member of the military, then had left that and had taken a job working for the government. Right. And so they were searching for her brother-in-law for that reason. And they were confronting her. Yes, they definitely did confront her, confronted her sister, her sister's son. They were all at the home on four different occasions. Two first times that the gorillas came, no incidents of violence. The third time they did rough up her sister and the son. Four times she was roughed up. But during all of that, it was looking for the brother-in-law. They never once mentioned, you know, his role in the government and whether or not they thought she carried the same opinion as him. It was strictly looking for the brother-in-law. And, again, this imputes literally the behavior of the gorillas. Did the BIA consider the on account of imputed political opinion? I would say considered. Not as to the rape where they did seem to, but as to the brother-in-law information. Yes, Your Honor. Really? If you go, actually, in this particular case, the Board of Immigration Appeals adopted and affirmed the immigration judge's decision according to matter of bravado, which means that all the decisions that the immigration judge gave in this case are also before this court as well. So in adopting the immigration judge's decision, you have to go look at what the immigration judge said. All right. So let's do that. I don't see if the immigration judge decided that either. That's why I began the question of your opponent with that. Well, Your Honor, actually, as we get into the weeds of this, the immigration judge looked at the severity of the harm in this particular case. Correct. And did not look at the nexus. Right. So he could have said that to begin with. Right. He didn't. Yes. Yes. So I was a little confused on where we were going. All right. All right. So he didn't and the BIA didn't with regard to the brother-in-law stuff? No, correct, because they just focused on the harm. Okay. And they found that harm was insufficient under the circuit's case law to establish past persecution. And so the rape was no nexus. The guerrilla incidents, the harm did not rise to the level of persecution. So for this reason, or for these reasons, the agency determined that she had not established past persecution. Then they turned to the question of whether or not she has a well-founded fear of future persecution. And since she didn't establish past persecution, she carries the burden to demonstrate that she has a well-founded fear of future persecution, and she has failed to do that in this case. She admitted that she's not afraid to go back to Guatemala because of what occurred with the guerrillas in the late 1980s. Instead, she is afraid to go back because of the violence in her country, because she might be targeted for appearing wealthy, for her and her son appearing to be deportees. And under the case law in this circuit, none of these reasons are sufficient to establish a future fear of persecution. So ultimately, when you step back and look at all the facts of this case, the agency did not err in concluding that the individual, the petitioner in this case, is not eligible for asylum. And there is no evidence to the record that compels a contrary conclusion, which is the standard that this court must find that petitioner meets in order to overturn that decision. And because petitioner failed to establish her eligibility for asylum, she can't meet the higher burden of proof required for withholding of removal. So the only other form of relief that's available that she applied for is protection under the Convention Against Torture. She has failed to identify any evidence in the record. If you go to her opening brief, she does not once identify any evidence in the record that shows that the Guatemalan government is going to consent, acquiesce, turn a blind eye to torture that may fall upon her if she goes back to Guatemala. Can I interrupt for one second? Can we go back to past persecution? Isn't there evidence in the record that the petitioner was threatened with death and at the same time subjected to a physical attack by the guerrillas? Yes, Your Honor. It was the fourth and final time that the guerrillas came to her sister's house in search of their brother-in-law. And during that incident, she was shoved. But she testified in her testimony is that she did not seek medical attention after that first encounter because she was not bleeding. She was only shoved. And under the cases of this circuit, this sort, I mean, I'm not trying to dismiss the harm that she experienced, but it is woefully insufficient to find that arises to the level of persecution. Let me ask you something. I think we can go back. Can I ask you a more legal version of that, a legal question version of that? When she was undoubtedly threatened quite, quite seriously a couple times, and as were her sister and her sister's son. Is that right? With death. Yes, Your Honor. You take all your teeth out and stuff like that. And so why are we looking, why do we look cumulative? I mean, the reason, as I understand it, for looking at physical harm when you're dealing with threats is to get some measure of whether these threats have any credibility, essentially. And if we have, so I would think that you wouldn't look only at the physical harm to her, but at the physical harm to the sister and the sister's son to see that these really are pretty violent guys. No? I mean, why are we just looking at the fact that they only shoved her? And the father, too. They really pushed him very hard against the wall and so on. Whether you look at the harm that petitioner herself experienced in a personal capacity or whether you take the harm collectively that the family experienced, it still is insufficient to establish past persecution. Like, for example, in 1995 in Versailles, the petitioner in that case had been hit in the stomach, kicked from behind, questioned by police about political activities, and then released six hours after the petition. But, Brad, cross-thought comes up all the time, and there, you know, it's your favorite case, the agency's favorite case in this question. You know, and then there are cases otherwise. I mean, I wouldn't say our case law on this issue is the model of consistency with regard to threats. Well, let me take a case in which this Court has found persecution involving a family, the exact case that petitioner cites in her opening brief, Machery v. Ashcroft from 2004. If you go look at the facts of that case, they are far more egregious than the facts in this case. The petitioners there were living in Germany and had been subjected throughout their time there to death threats, vandalism. It just wasn't the parents. It was also the child, the children who came home after being beat up at school. One son had his cheek sliced open with a knife. Then they had their home broken into. The severity of harm in which this Court has found persecution is far greater than in this case. Again, by petitioner's own. Does that case set a baseline? In other words, anything less severe than that doesn't count? Well, Your Honor, what I'm trying to provide the Court here is with guideposts, right? We gave you a case in which Prasad, decades old, sets a standard, and then I gave you Machery, which sets another standard. And it falls in between or maybe outside these cases. And arguably that is what the government is saying. The harm by petitioner's own mouth that she experienced wasn't that bad. She was shoved and she wasn't bleeding. And so ultimately, looking at those facts, they're not sufficient to establish past persecution in this case. Okay, your time is up. But I have one last question for you. Yes. This case has been in the system for a long time. Is that right? Since the early 90s. Yes, Your Honor. What happened? The legal process does take time, Your Honor. Wait. This woman. Twenty-seven years? This woman applied for asylum in the 90s. She affirmatively applied for asylum in 1990. Is that right? I believe it was 1991. All right, 1991. The next we hear from her is at some point she applies for TPS. Is that right? Temporary Protected Status. She applied for a variety of relief. And then what happens? Twenty years later, all of a sudden there's a notice to appear. Your Honor, I understand the frustration. It's not a question of frustration. It's a question of, you know, at some point. I learned recently that there used to be a statute of limitations on removals. And this is the kind of case that makes you think that there ought to be latches or something. The government knew this woman was in the system for 27 years. She ran her life and she had her children and she lived her life. And there's no criminal accusation, right? Your Honor, she was convicted of multiple misdemeanors and felonies, and that's the reason why she was ineligible for NRCARA and other types of relief. That's not an issue in this case because she waived it and decided to not advance those arguments. But she seemed to have been ‑‑she couldn't have had an aggravated felony because she's apparently eligible for asylum. We're not making that argument here. And the basis for removal isn't any of the crimes, is it? No, no. But those crimes were crime involving moral turpitude, which is what made her ineligible for that other form of relief. But it isn't what made her eligible for removal. No, no, Your Honor. It's just being removed for being here illegally, period, the end. Yes. And just one thing, if I might add, before I sit down, is you say that this case has been languishing in the court system for 28 years. Well, the agency was handling the case for, I would say, about 20 of those years. It's been pending before this circuit for the past 6 years. But that's the question. So it's been 28 years. That's exactly it. But that's the problem. In other words, if it were ‑‑ we know what goes on in the court system, but why did it take 20 years before she was charged with removal? I mean, it's not necessarily it took that long to charge her with removal. Right? Because she did file an affirmative asylum application, and it was determining whether or not she was eligible for any other forms of relief. And that does take time. You have to gather evidence in order to try to present your case. All right. And so both sides. Okay. I was just curious. That caught my eye. That had been a long time. That's all right. Thank you. Can I just say one other thing? Oh, yes. For the next arguments, I don't know whether the people are going to be in the same room, but it's very strident and hard to listen to. So if somebody could readjust the video, I'd appreciate it. Okay. We'll try, Your Honors. Thank you so much. Very loud, strident, hard to listen to. Okay. You have a minute for rebuttal. Thank you, Your Honor. Well, I'm, frankly, a little dumbfounded that the judge did not find past persecution in this case. I read the testimony, and a child being gang-raped at age 11 is ---- He didn't say that wasn't persecution. He said there was no nexus. There was no nexus to a protected ground. Right. You have not. I looked at your brief again. You may have told us now why there was a protected ground, but it's not in your brief, is it? Correct. Correct. So until you stood up here, you have not told anybody what the protected ground is with regard to the rape. Correct. However, I think at this point that the judge gave very short shrift analysis of what was going on with the gang rape when this woman was ---- I think what Judge Berzon is saying is that it doesn't matter because you didn't press that in your brief. What you did press in your brief is the death threat plus the violence. So why does that rise to the level of past persecution? Well, you have to look at it in the backdrop of the civil war that was ongoing in Guatemala. That civil war lasted for 36 years. Thousands upon thousands of people lost their lives in that war. Is it still going on? It's not still going on. Okay. So is there ---- granted, she suffered past persecution on account of the civil war, but it's no longer going on. So is that past persecution under the relevant case law and the statutes a basis for withholding removal or asylum where the situation on the ground has completely changed? Well, I don't think the situation in Guatemala today is very good. I mean, why are we ---- That's not the point, though. The point is, is there a connection between the persecution she suffered many years ago and the situation that's now ongoing in Guatemala? Well, I would say yes, that in the sense that she ---- Wouldn't that come into play in any rebuttal the government would have to make? Wouldn't that argument that conditions in Guatemala are entirely different than they were back in the 80s, isn't that how the government would show changed circumstances? Correct. I agree with you on that. But, I mean, even the country condition reports from 2004 and 2005 showed that the situation in Guatemala had not improved at all. So there's still a guerrilla ---- There's still a civil war going on in Guatemala? There's not a civil war today, no. But the civil war ended in 1996, but there were still vast human rights abuses occurring in Guatemala. The problem, of course, is that our asylum laws are very limited. And that's a lot of what the whole debate is about immigration right now. We have all these people who are undoubtedly being exposed to horrific situations in Central America, but they're not covered by our statute, for the most part. That's the problem. Thank you. Thank you very much, Your Honor. We appreciate both arguments. The matter is submitted.
judges: Paez, Berzon, Feinerman